UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRIAN PILON, *et al.*,

Petitioners,

-v-

DISCOVERY COMMUNICATIONS, LLC,

Respondent.

24-CV-4760 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

In this case, Petitioners Brian Pilon and Russell Stephen, and Respondent Discovery Communications, LLC ("Discovery"), agree that their dispute concerning alleged federal and California privacy law violations belongs in arbitration. But they disagree on where. Before the Court now are Pilon's and Stephen's petition to compel arbitration before Judicial Arbitration and Mediation Services ("JAMS") and Discovery's cross-motion to compel arbitration before National Arbitration and Mediation ("NAM"). Discovery moves also for limited discovery concerning Stephen's assent to the arbitration agreement selecting NAM. For the reasons that follow, the petition is granted as to Stephen and denied as to Pilon; the cross-motion is denied as to Stephen and granted as to Pilon; Discovery's request for discovery is denied; and the action is stayed until such arbitrations have been had in accordance with the parties' agreements.

I.    **Background**

A.    **Factual Background**

The following facts are drawn from the parties' submissions and, unless noted, not in dispute. Discovery is a large media company that offers a streaming platform, Discovery+, featuring "an array of real-life, nonfiction television series and specials." (ECF Nos. 1 ("Pet.") ¶ 1; 20 ("Waibel Dec.") ¶ 3.) Discovery+ is accessible by users on its website, smart phone

application, and television application.  (Waibel Dec. ¶ 5.)  To access content on Discovery+,

users must create accounts by entering a username and password and accepting a "Visitor

Agreement and Privacy Notice" containing terms governing the relationship between Discovery+

and its users.  (*Id.* ¶ 6.)  All types of Discovery+ accounts are offered on a "month-to-month"

subscription basis, which permits users to cancel at any time to prevent being billed for the

following month.  (*Id.* ¶ 8.)  Users are able to log into the Discovery+ service even after their

subscriptions have ended, and users with current subscriptions may, under certain circumstances,

extend those subscriptions to "authorized users" who do not themselves pay for Discovery+

subscriptions.  (*Id.* ¶ 10.)

       For many years and through several revisions, the Discovery+ Visitor Agreement and

Privacy Notice contained arbitration provisions selecting JAMS as its arbitral forum.  (Pet. ¶ 3;

ECF No. 11 ("Pet. Mem.") at 8-9.)  That version of the agreement (which is really several

versions of the agreement, but one—the "First Visitor Agreement"—for present purposes) also

contained provisions purporting to describe how it could be modified.  First, it stated at the

beginning:

> We may change the terms of this Visitor Agreement from time to time to
> accommodate changes in the marketplace.  By continuing to use any of the
> discovery+ offerings on discovery+ after we post any such changes, you accept this
> Visitor Agreement, as modified.  We may change, restrict access to, suspend or
> discontinue discovery+, or any portion of discovery+, at any time.  **YOUR
> CONTINUED USE OF DISCOVERY+ FOLLOWING THE POSTING OF
> CHANGES TO THIS VISITOR AGREEMENT WILL MEAN YOU
> ACCEPT THOSE CHANGES.  UNLESS WE PROVIDE YOU WITH
> SPECIFIC NOTICE, NO CHANGES TO OUR VISITOR AGREEMENT
> WILL APPLY RETROACTIVELY.**

(ECF No. 4-1 ("First Visitor Agreement") at 2 (emphasis in original).)  Moreover, the agreement

contained a clause addressing modifications and retroactivity with respect to its arbitration

provisions:

> **Modification of Arbitration Clause With Notice.** Discovery may modify these arbitration provisions, but such modifications shall only become effective thirty (30) days after Discovery has given notice of such modifications and only on a prospective basis for claims arising from Discovery Transactions and Relationships occurring after the effective date of such notification . . . .

(*Id.* at 22.)  The agreement also selected New York law to govern disputes and contained a clause delegating disputes over arbitrability to the arbitrator.  (*See id.* at 21-22.)

Pilon signed up for a Discovery+ account on August 5, 2021 and has made month-to-month subscription payments ever since.  (Waibel Dec. ¶ 16.)  Stephen, meanwhile, created his account on January 15, 2021.  (*Id.* ¶ 22.)  His subscription expired, and he stopped making payments in April 2022, though Stephen did log into his account at least once in June 2024.  (*Id.* ¶¶ 22-24.)

On January 6, 2023, Pilon and Stephen, through counsel, sent letters to Discovery indicating that they intended to assert video privacy claims under federal and California law.  (*See* Pet. Mem. at 10; ECF Nos. 4-2, 4-3 (together, the "Pre-Arbitration Notices").)[1]  Those letters also indicated that Pilon and Stephen were prepared to engage in arbitration with Discovery over those claims consistent with the First Visitor Agreement, but did not cite any particular arbitration procedure to be used.  (*See* Pre-Arbitration Notices at 3.)

On the same day that the Pre-Arbitration Notices were delivered to Discovery—January 9, 2023—Discovery updated the visitor agreement governing Discovery+ (the "Second Visitor Agreement").  (Waibel Dec. ¶ 11.)  To notify users of the change, Discovery emailed the below

---

[1] The letters are dated January 6, 2023.  (*See* ECF Nos. 4-2, 4-3.)  The parties do not appear to dispute that the letters were sent on January 6, 2023, and delivered to Discovery's registered agent on January 9, 2023.  (*See* ECF No. 4 ¶ 2.)  In any event, the difference is irrelevant.

notice, including a hyperlink to the Second Visitor Agreement's terms, to all Discovery+ subscribers on February 1, 2023.  (*Id.* ¶ 12.)



(*Id.*)  And beginning on February 1, 2023, Discovery added pop-up notifications on the Discovery app and website:



(*Id.* ¶ 13 (in-app notification).)

4

We've updated our Visitors Agreement.
These updates contain important info about your legal rights,
including an updated arbitration clause. By subscribing, and/or
continuing to subscribe to discovery+, you agree to our updated
Visitors Agreement. Read the updated Visitors Agreement
at https://www.discoveryplus.com/terms.

(*Id.* ¶ 14 (website notification).)

According to Discovery's records, Pilon clicked through both the website and in-app notifications in order to use Discovery+ to stream content after February 1, 2023, including on March 27, 2023, to stream an episode of a television show that was not available at the time Pilon's subscription renewed on March 12, 2023.  (*Id.*  ¶¶ 18-20.)

The Second Visitor Agreement contains several new arbitration provisions, including selecting NAM as the arbitral forum, rather than JAMS.  (ECF No. 24-8 ("Second Visitor Agreement") at 18.)  In particular, the Second Visitor Agreement contained specialized procedures for arbitrating mass claims in stages, providing:

> If, at any time, 25 or more claimants (including you) submit Notices or seek to file demands for arbitration raising similar claims against the other party or related parties by the same or coordinated counsel or entities, consistent with the definition and criteria of Mass Filings ("Mass Filing") set forth in NAM's Mass Filing Supplemental Dispute Resolution Rules and Procedures ("NAM's Mass Filing Rules," available at https://www.namadr.com/resources/rules-fees-forms/),  you and we agree that the additional procedures set forth below shall apply.  The parties agree that throughout this process, their counsel shall meet and confer to discuss modifications to these procedures based on the particular needs of the Mass Filing. The parties acknowledge and agree that by electing to participate in a Mass Filing, the adjudication of their dispute might be delayed.  Any applicable limitations period (including statute of limitations) and any filing fee deadlines shall be tolled beginning when the Mandatory Pre-Arbitration Notice and Informal Dispute Resolution Procedures are initiated, so long as the pre-arbitration Notice complies with the requirements in this Arbitration Agreement, until your claim is selected to proceed as part of a staged process or is settled, withdrawn, otherwise resolved, or opted out of arbitration.

(*Id.* at 20-21.)  The procedures permit a maximum of fifty claims to proceed first, then another 100 claims, and then another 200 claims, with each stage followed by a global mediation session.

(*See id.* at 21.)  The agreement provides that for any claim not resolved through that staged procedure, the claimant may opt out of arbitration in writing or remain in arbitration, proceeding in batches of 200 randomly selected claims.  (*See id.* at 21-22.)

In addition to the mass-filing provisions, the Second Visitor Agreement purports to apply its arbitration provisions retroactively to already accrued claims, specifying:

> This Arbitration Agreement is intended to be broadly interpreted.  It includes, but is not limited to . . . claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising) . . . .

(*Id.* at 16.)  It also contains a clause containing choice-of-law and forum-selection provisions:

> These Terms shall be governed by the laws of the State of New York, without regard to conflict of law principles.  Any dispute that is not subject to arbitration, or any issues involving arbitrability or enforcement of any provisions under the dispute resolution clause or Arbitration Agreement shall be brought in the appropriate state or federal court located in New York County, New York.

(*Id.* at 23.)

### B.    Procedural Background

After the parties' "settlement discussions broke down," on May 2, 2024, Pilon and Stephen filed individual arbitration demands with JAMS against Discovery, asserting claims under federal and California law.  (Pet. Mem. at 13-14.)  Discovery objected to arbitrating before JAMS, contending that the arbitration should proceed before NAM according to the Second Visitor Agreement.  (*Id.* at 14.)  JAMS, under the impression that the Second Visitor Agreement had taken effect before the filing of Pilon's and Stephen's arbitration demands and thus controlled, indicated that it would not proceed with arbitration in the absence of a court order.  (*Id.* at 15.)

On June 21, 2024, Petitioners filed a petition in this Court to compel arbitration with Discovery pursuant to the First Visitor Agreement.  (Pet.)  They filed a memorandum in support of the petition on July 5, 2024.  (Pet. Mem.)  On August 19, 2024, Discovery filed a

cross-motion to compel arbitration pursuant to the Second Visitor Agreement.  (ECF No. 18.)

On the same day, Discovery filed memoranda in support of that cross-motion (ECF No. 19

("Cross-Mot. Mem.")) and in opposition to the petition (ECF No. 22 ("Pet. Opp.")).  On

September 16, 2024, Petitioners opposed the cross-motion (ECF No. 29 ("Cross-Mot. Opp."))

and replied in further support of the petition (ECF No. 30 ("Pet. Reply")).  On October 7, 2024,

Discovery replied in further support of the cross-motion.  (ECF No. 33 ("Cross-Mot. Reply").)

The parties submitted additional briefing concerning new authority on November 1, 2024 (ECF

No. 37 ("Pets. Supp. Ltr.")) and November 5, 2024 (ECF No. 28 ("Resp. Supp. Ltr.")).

## II.    Legal Standard

The Federal Arbitration Act ("FAA"), reflecting a "liberal federal policy favoring

arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24

(1983), provides for the judicial enforcement of arbitration agreements "save upon such grounds

as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter

4."  9 U.S.C. § 2.  Any party to such a contract "aggrieved by the alleged failure, neglect, or

refusal of another to arbitrate under a written agreement for arbitration may petition any United

States district court" which would otherwise have jurisdiction over the subject matter of the

dispute to enforce the agreement.  9 U.S.C. § 4.  So, too, may a party already litigating in district

court file a motion to compel arbitration.  9 U.S.C. § 6.  In deciding petitions and motions to

compel arbitration under Sections 4 and 6 of the FAA, "the court applies a standard similar to

that applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175

(2d Cir. 2003); *see also Meyer v. Uber Techs.*, 868 F.3d 66, 74 (2d Cir. 2017).  In doing so, the

court "must consider all relevant, admissible evidence submitted by the parties and contained in

pleadings, depositions, answers to interrogatories, and admissions on file, together with

affidavits."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (cleaned up).

"[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* (quotation marks omitted).

## III. Discussion

Four established FAA principles guide the resolution of this case. First, as arbitration is ultimately a matter of contract, whether the parties have agreed to arbitrate—that is, assented to such a contract—is a question for the court to decide. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 148-49 (2024). Second, in the absence of a valid contract clearly delegating questions of arbitrability to an arbitrator, the court is to decide those issues as well. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." (cleaned up)); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 72 (2019). Third, though ordinarily arbitration provisions are "severable" from the remainder of a contract such that unconscionability challenges to the entire agreement go to the arbitrator, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448-49 (2006), they are not severable where "a party challenges the validity under § 2 of the precise agreement to arbitrate at issue." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010). And fourth, when considering direct substantive challenges to arbitration clauses, the court is to turn to the applicable state's general contract law to resolve them. *See* 9 U.S.C. § 2; *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("A court may not . . . in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law."). Thus, like many arbitration cases, this one involves four inquiries: (1) formation, (2) delegation, (3) severability, and (4) the application of substantive contract law. Each is addressed in turn.

8

### A.      Formation of the Second Visitor Agreement

Forming any contract, including a contract to arbitrate, requires mutual assent as defined by the applicable state law. *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002); *see also Brooks v. WarnerMedia Direct, LLC*, No. 23-CV-11030, 2024 WL 3330305, at *8 (S.D.N.Y. July 8, 2024). Consistent with New York's choice-of-law rules,[2] to determine whether a contract has been formed, the Court must first determine the correct law to apply without regard to any choice-of-law clause contained in the contract itself, as formation is a prerequisite to the

---

[2] The determination of which choice-of-law rules to apply in this case, brought pursuant to the Court's federal-question and supplemental jurisdiction under 28 U.S.C. §§ 1331 and 1367 (*see* Pet. ¶ 27), is less than straightforward. In most FAA cases, the underlying dispute between the parties arises purely under state contract law, and the federal court has jurisdiction over the case only under the diversity statute, 28 U.S.C. § 1332(a). *See Wash. Nat'l Ins. Co. v. OBEX Grp. LLC*, 958 F.3d 126, 133-34 (2d Cir. 2020). When federal courts sit in diversity, they are required to apply the choice-of-law rules of the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). But in the narrower category of cases in which the underlying dispute between the parties arises under federal law, such that a federal court may exercise federal question jurisdiction pursuant to 28 U.S.C. § 1331, it is not obvious which choice-of-law rules the court is to apply. For some of the limited appellate court discussion of this issue, see *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 862 (9th Cir. 2022) (Barker, J., concurring); *Setty v. Shrinivas Sugandhalaya LLP*, 986 F.3d 1139, 1148-50 (9th Cir. 2021) (Bea, J., dissenting), *opinion withdrawn and superseded*, 998 F.3d 897 (9th Cir. 2021), 3 F.4th 1166 (9th Cir. 2021). As a practical matter, many federal courts simply resort to the *Klaxon* rule when exercising federal question jurisdiction and confronted with a state law issue. *See* Zachary D. Clopton, *Horizontal Choice of Law in Federal Court*, 169 U. Pa. L. Rev. 2193, 2202 (2021) ("[A] review of lower federal court decisions finds that federal courts follow *Klaxon* not only for diversity cases but also when applying state law in federal question and supplemental jurisdiction cases. And for many other jurisdictional bases, there is no indication that federal courts do anything but *Klaxon*.") But that is not the only available approach. *See generally* Tobias Barrington Wolff, *Choice of Law and Jurisdictional Policy in the Federal Courts*, 165 U. Pa. L. Rev. 1847 (2017) (arguing that *Klaxon* does not require federal courts to apply the choice-of-law rules of the state in which they sit when exercising a source of jurisdiction beyond Section 1332(a)). But because the parties have not briefed the issue, and because the Court is confident that any other choice will make no difference in the ultimate outcome of the case, the Court is content to apply New York's choice-of-law rules. *See also Berman*, 30 F.4th at 862 (Barker, J., concurring) ("I think analysis of the Supreme Court's decisions . . . favors applying forum state choice-of-law rules to state-law issues arising in federal-question cases, at least where Congress has vested concurrent jurisdiction in state and federal courts.").

enforcement of such a clause.  *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2010).

New York selects the law governing contract formation by conducting an "interest analysis," considering "[i] the place of contracting; [ii] the place of the contract negotiations; [iii] the place of the performance of the contract; [iv] the location of the subject matter of the contract; and [v] the domicile, residence, nationality, places of incorporation, and places of business of the parties."  *Brooks*, 2024 WL 3330305, at \*9 (quoting *Philips Credit Corp. v. Regent Health Grp., Inc.*, 953 F. Supp. 482, 502 (S.D.N.Y. 1997)).  Discovery contends that "Petitioners concede New York law governs by citing New York law in the section of the brief concerning [contract] formation" and that both contracts at issue "contained a New York choice of law provision."  (Cross-Mot. Mem. at 20 n.8.)

The Court agrees with Petitioners for the purposes of the law governing contract formation.  As a starting matter, that the visitor agreements purport to select New York law is irrelevant for selecting the law to govern formation, which, as explained, is an issue antecedent to the scope of any choice-of-law clause.  *Schnabel*, 687 F.3d at 119.  And though it is true a party may concede the applicability of one state's law through exclusive citations to decisions applying that law in briefing, Petitioners' citations are not so clear as to constitute such a concession.  In fact, Petitioners have, throughout their briefing in this case, reserved the right to invoke California law and have cited cases applying it.  Indeed, Discovery supplies no answer to Petitioners' response that "Pilon contends California law applies and cites New York law in this filing only for completeness" and that "California has the strongest interest here because Pilon claims the protection of that state's laws, where he lives, where all relevant events took place, and where all the contracts were formed."  (Cross-Mot. Opp. at 17 n.3.)

Applying New York's choice-of-law rules to the formation of the visitor agreements, the Court concludes that California law governs the issue of formation.  Here, like in *Brooks*—a case on which Discovery frequently relies—though "Respondent is a resident of New York," "Petitioners are all residents of California," and seemingly "signed up for their [Discovery] accounts in and utilized [Discovery's] streaming services from California," *cf. Brooks*, 2024 WL 3330305, at *9.  (*See* Pet. ¶¶ 24-26; ECF Nos. 2, 3.)  Aside from Discovery's unfounded arguments regarding waiver and the choice-of-law clause (which is inapplicable to formation), it offers no argument that any applicable choice-of-law rule would select non-California law to govern formation of the visitor agreements.  "Accordingly, [because] the performance of the contract and the impact of any injury incurred therefrom occurred in California," and because Discovery does not make any persuasive arguments to the contrary, "it is appropriate to apply California law to issues of contract formation in this case."  *Cf. Brooks*, 2024 WL 3330305, at *9-10.  That said, however, "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'"  *Meyer*, 868 F.3d at 74 (quoting *Schnabel*, 697 F.3d at 119).

"Under California law, the formation of a contract requires 'the parties [to] manifest their mutual assent to the terms of the agreement.'"  *Brooks*, 2024 WL 3330305, at *10 (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022)).  That principle applies "with equal force" to agreements formed via the internet, on the theory that, under the right circumstances, users of an electronic service are on "inquiry notice" of the terms of such agreements and have thus consented to be bound by them.  *See Berman*, 30 F.4th at 855-56.  Specifically, California law determines the validity of internet contracts with reference to "the way in which the user purportedly gives their assent to be bound by the associated terms:

browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Keebaugh v. Warner Bros. Ent., Inc.*,
100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 15
(Cal. Ct. App. 2021)). Scrollwrap contracts—essentially always enforceable—require the
electronic user to scroll through a full list of terms and conditions before accepting them. *See id.*
Clickwrap contracts are similarly often enforceable, and "require[] users to click on an 'I agree'
box after being presented with a list of terms and conditions of use." *Id.* (citing *Nguyen v.
Barnes & Noble Inc.*, 763 F.3d 1171, 1178-79 (9th Cir. 2014)).

By contrast, browsewrap contracts—in which consumers are deemed to have accepted
posted terms of an electronic service merely by continuing to use the service—are rarely
enforceable unless the terms are conspicuously displayed on the electronic service. *See Nguyen*,
763 F.3d at 1177. But "[c]ourts have also been more willing to find the requisite notice for
constructive assent where the browsewrap agreement resembles a clickwrap agreement—that is,
in which the user is required to affirmatively acknowledge the agreement before proceeding with
use of that website." *Id.* at 1176. That is because, unlike a pure browsewrap, when a user must
affirmatively acknowledge terms that are hyperlinked, they are on notice of the terms' existence,
much like when someone agrees to "a multipage written paper contract." *Fteja v. Facebook,
Inc.*, 841 F. Supp. 2d 829, 840 (S.D.N.Y. 2012) (quotation marks omitted); *see also Berkson v.
Gogo LLC*, 97 F. Supp. 3d 359, 397-98 (E.D.N.Y. 2015). That bespeaks a more general
principle: "[T]o establish the enforceability of a browsewrap agreement, a textual notice should
be required to advise consumers that continued used of a Web site will constitute the consumer's
agreement to be bound by the Web site's terms of use." *Long v. Provide Com., Inc.*, 200 Cal.
Rptr. 3d 117, 126 (Cal. Ct. App. 2016) (citing *Nguyen*, 763 F.3d at 1178-79).

Since *Long*, California courts have treated the middle ground between browsewrap and clickwrap contracts as "sign-in wrap agreements," which "do include a textual notice indicating the user will be bound by the terms, but . . . do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an 'I agree' button.  Instead, the consumer is purportedly bound by clicking *some other* button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to 'sign in.'"  *Sellers*, 289 Cal. Rptr. 3d at 21.  Such a contract is enforceable if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Keebaugh*, 100 F.4th at 1014 (quoting *Berman*, 30 F.4th at 856).  Terms are "reasonably conspicuous" when they are "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," which for a hyperlink means that the hyperlink is "readily apparent," rather than "simply underscore[ed]."  *Id.* at 1014 (cleaned up).

### 1.    Pilon's Assent to the Second Visitor Agreement

Turning to this case, Pilon's unambiguous assent is straightforward.  He does "not dispute that [he] received reasonably conspicuous notice of [Discovery's] updated terms of use," *cf. Brooks*, 2024 WL 3330305, at *11, in a pop-up on the Discovery app and website, along with an email.  (Waibel Dec. ¶¶ 12-14; *see also* Cross-Mot. Opp. at 20.)  To close the pop-up on the Discovery website, users—including Pilon—had to press an "X" button in "the top right corner of the notification."  (*Id.* ¶¶ 14, 18.)  Not only did Pilon click through the conspicuous notice of the change, but he also continued to subscribe to and use Discovery+, including by streaming an episode of television.  (*Id.* ¶¶ 18-20.)  Because Pilon was "explicitly advised" that renewing his

subscription and continuing to use Discovery's service would "constitute assent to the terms and conditions of" the Second Visitor Agreement, *cf. Berman*, 30 F.4th at 857, he unambiguously assented to that agreement as a sign-in wrap contract. *See also Brooks*, 2024 WL 3330305, at *11 ("[A] contract may be formed where users receive sufficient inquiry notice of a website's terms of use via email and thereafter continue to use the site." (collecting cases)).

It is thus irrelevant that, according to Petitioners, it would have been unreasonable for Pilon to expect a retroactive change to the arbitration procedure based on the First Visitor Agreement (*see* Pet. Reply at 7; Cross-Mot. Opp. at 20), because, as Petitioners themselves point out, California's "rules to determine whether meaningful assent has been given" work to "avoid the unfairness of enforcing contractual terms that consumers never intended to accept." (*See* Cross-Mot. Opp. at 20 (quoting *Berman*, 40 F.4th at 856). Petitioners' argument that Discovery cannot "force a consumer to assent, by mere inquiry notice, to unilateral changes it makes to impede the resolution of an ongoing dispute" (Cross-Mot. Opp. at 21) misunderstands the nature of inquiry notice. The theory does not permit the enforcement of a contract that reasonable consumers would not read. Instead, the doctrine explains the types of contracts that the law deems consumers to have read, obviating any unfairness Pilon argues stems from his acceptance of the Second Visitor Agreement's new arbitration provisions. Moreover, even if Pilon had no reason to expect retroactive arbitration provisions in light of the First Visitor Agreement, he had plenty of reason—according to the law of inquiry notice—to expect new terms in that contract, and if he had read it, he would have found the retroactive provisions. Pilon's inquiry notice here is all the more plausible given Petitioners' emphatic support for these very types of agreements in their opening brief, where they note that "[c]ourts around the country have recognized that an electronic 'click' can suffice to signify the acceptance of a contract, and that there is nothing

automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." (Pet. Mem. at 17 (quoting *Meyer*, 868 F.3d at 75).)[3]

Because, as to Pilon, the Second Visitor Agreement satisfied the requirements for an enforceable sign-in wrap contract under California law, his particular expectations about the contents of that agreement do not destroy his unambiguous assent to it as a matter of law.

### 2.    Stephen's Assent to the Second Visitor Agreement

Stephen's case is different. Unlike Pilon's subscription, Stephen's "expired on April 29, 2022," before any purported formation of the Second Visitor Agreement. (Waibel Dec. ¶ 22.) And though Discovery represents that "Stephen logged in to his discovery+ account on the discoveryplus.com website," his "activity after he logged in to his discovery+ account is not available in Discovery's records." (*Id.* ¶ 24.) Importantly, Discovery makes no representation that Stephen continued to subscribe to discovery+ after receiving notice of the Second Visitor Agreement, only that it is likely that he "continued to use the discovery+ service even after his subscription expired, potentially on another individual's account." (Pet. Opp. at 29.) Though Discovery contends that use of another's account may bind that user to the terms governing the account in general, that is not the case here, because two of the three forms of notice specified that "continuing to subscribe" (*see* Waibel Dec. ¶¶ 13, 14) was the "action" by which the consumer would "unambiguously manifests his or her assent to those terms." *Cf. Keebaugh*, 100

---

[3] Petitioners' argument that, because the First Visitor Agreement contains a provision purporting to limit retroactive modifications, the Second Visitor Agreement was never formed (*see* Cross-Mot Opp. at 21), is unavailing. Even if Petitioners were correct about the ability of the First Visitor Agreement to limit future modifications (and they are not, *see infra* § III.D.2), such a limitation would affect only the enforceability of the Second Visitor Agreement's retroactive terms, rather than the formation of the modified agreement as whole.

F.4th at 1014 (quoting *Berman*, 30 F.4th at 856).  Stephen's potential continued use, without continued subscription, could not have constituted unambiguous consent.  The case is thus different from *Brooks*, where Judge Failla concluded that continued use by an authorized user could constitute unambiguous assent, in light of a notice that provided for acceptance "[b]y continuing to subscribe to *and/or access*" the electronic service in question.  *Cf. Brooks*, 2024 WL 30330305, at *3, 14 (emphasis added).  And though the email notice in this case did provide for acceptance through "continued subscription to and/or access of discovery+" (Waibel Dec. ¶ 12), that the notices contain different mechanisms of acceptance renders any assent Stephen did manifest through potential subsequent use ambiguous at best, and thus insufficient under California law.

Accordingly, Discovery's request for discovery as to Stephen's assent to the Second Visitor Agreement is denied, because Discovery's allegation that Stephen never subscribed after receiving notice of the Second Visitor Agreement (assuming even that he did receive such notice) renders any further discovery futile.  And because Stephen did not assent to that agreement, he is not bound by its arbitration provisions.  Thus, the petition to compel arbitration consistent with the First Visitor Agreement—to which Discovery mounts no legal objections other than supersession—is granted as to Stephen.  Discovery's cross-motion is likewise denied as to him.

### B.    Delegation of Arbitrability

Move now to the second FAA principle: the role of delegation clauses, which work to send questions of arbitrability—in addition to the underlying merits of a dispute—to an arbitrator.  When parties' valid agreements lack a delegation clause, the court's task is clear: determine arbitrability for itself.  *See Henry Schein*, 586 U.S. at 72.  And, conversely, when parties have clearly confirmed their intent to delegate questions of arbitrability and neither

challenges that provision specifically, the court is to leave the arbitrability decision to the arbitrator. *See Rent-A-Center*, 561 U.S. at 63. "But, where . . . parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Coinbase*, 602 U.S. at 152.

Though the parties supply the full text of both visitor agreements, neither party makes any allusion to the fact that, like in *Coinbase*, the agreements here contain conflicting forum-selection clauses on the issue of arbitrability. The First Visitor Agreement explicitly delegates arbitrability questions to the arbitrator, providing:

> **Arbitrator Will Interpret This Agreement.** The Arbitrator, and not any federal, state or local court or agency, shall have the exclusive authority to resolve any dispute arising under or relating to the validity, interpretation, applicability, enforceability or formation of this Visitor Agreement and/or these arbitration provisions in this Section hereof, including but not limited to any claim that all or any part of this Visitor Agreement is void or voidable.

(First Visitor Agreement at 21.) But the Second Visitor Agreement, lacking that clause, provides instead: "[A]ny issues involving arbitrability or enforcement of any provisions under the dispute resolution clause or Arbitration Agreement shall be brought in the appropriate state or federal court located in New York County, New York." (Second Visitor Agreement at 23.)

This conflict is to be governed by generally applicable contract principles. *Coinbase*, 602 U.S. at 152. As to Pilon, his manifested assent to the Second Visitor Agreement, *see supra* § III.A.1, extinguishes any right he once had under the delegation clause.[4] *Cf. Dallasa*

---

[4] Though the parties dispute whether a modification applicable to accrued contract claims is enforceable, that dispute does not extend to a subsequent forum-selection clause that supersedes a delegation clause. That is because the arbitrability decision is not a *claim* that *accrues*, but merely a forum-selection determination based on the scope of an agreement to arbitrate. In any event, because the Court concludes that the Second Visitor Agreement constitutes a proper modification of the First Visitor Agreement, *see infra* § III.D.2, there is no reason to doubt the propriety of the Second Visitor Agreement's forum-selection clause. And

*Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003).  As to Stephen, because he did not assent to the Second Visitor Agreement, and because Discovery challenges no other aspect of the First Visitor Agreement, the delegation clause works to send arbitrability disputes over his claims to the arbitrator.  But as no arbitrability disputes remain in this case as to Stephen, the Court need not consider the precise contours of the delegation clause to resolve the petition and cross-motion.

### C.    Severability of the Arbitration Provisions

Assured that the relevant parties have not agreed to delegate questions of arbitrability to an arbitrator, the Court must next ascertain whether Petitioners' substantive challenges to the Second Visitor Agreement are directed at the arbitration provisions themselves, or to the agreement as a whole.  That is because "challenges to a contract containing an arbitration clause fall into two categories: those that challenge the contract as a whole, and those that challenge the arbitration clause in particular.  If the challenge is to the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 61 (2d Cir. 2012) (citation and quotation marks omitted).  But the FAA "does not permit the federal court to consider" general challenges to contracts containing enforceable arbitration provisions, *see id.* (quoting *Buckeye*, 546 U.S. at 445, with the exception of challenges to the formation of an agreement, *Granite Rock Co. v. Int'l Bd. of Teamsters*, 561 U.S. 287, 296 (2010).

---

ultimately, Petitioners appear content to let the Court—rather than an arbitrator—make arbitrability decisions in this case, seeing as they base their petition on substantive challenges to the Second Visitor Agreement and make no argument concerning the legal effect of the First Visitor Agreement's delegation clause.

Neither party has briefed this issue.  Nevertheless, it is sufficiently clear that Petitioners' challenges to the Second Visitor Agreement are directed at the arbitration clause contained in that agreement, rather than the agreement as a whole.  First, Petitioners contend that the Second Visitor Agreement's arbitration clause could not modify the First Visitor Agreement's arbitration clause because the latter clause contains a specific prohibition on modifications with respect to accrued claims.  (*See* Cross-Mot. Opp. at 18-24.)  And second, Petitioners argue that the Second Visitor Agreement's arbitration clause is unconscionable because, in part, of the substantive unfairness of the arbitration procedure it selects and because of California state law prohibiting class action waivers in consumer contracts.  (*See* Pet. Mem. at 22-26.)  Because both challenges turn not on any agreement as a whole, but on the specific provisions for arbitrating disputes, they are properly before the Court.  *See Rent-A-Center*, 561 U.S. at 71.

### D.    Substantive Challenges to the Arbitration Provisions

Past all of those threshold considerations lies one core dispute:  Where are the parties to arbitrate?  Answering that question requires addressing three more:  First, which state's law supplies the substantive contract law principles applicable in this case?  Second, did the Second Visitor Agreement modify the First Visitor Agreement?  And third, if the Second Visitor Agreement indeed modified the First Visitor Agreement, is the modification nevertheless unconscionable?

### 1.    Choice of Law Governing Enforceability

Again, the Court begins with New York's choice of law rules—this time, those that concern the effect of a contract clause that selects New York law to govern disputes between the

parties.[5]  To reiterate, in New York, a choice-of-law clause does not dictate the law applicable to

the formation of the very agreement containing such a clause.  *Schnabel*, 697 F.3d at 119.  But

once the parties have formed a valid agreement, they may select a particular state's law to govern

challenges to its enforceability.  *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115,

121 (2d Cir. 2010) (applying New York law to an unconscionability challenge to an arbitration

clause because "the arbitration agreement at issue contains a choice-of-law clause which

provides that New York law will govern the agreement's construction and enforcement");

*Behrens v. JPMorgan Chase Bank, N.A.*, No. 21-2603, 2024 WL 1090856, at *3 (2d Cir. Mar.

13, 2024) (summary order) (similar, for an arbitration agreement selecting Illinois law to

govern).

Here, both visitor agreements manifest intent to be bound by New York law.  The First

Visitor Agreement provides:  "This Agreement has been made in and shall be construed in

accordance with the laws of the State of New York, without giving effect to any conflict of law

principles."  (First Visitor Agreement at 22.)  Likewise, the Second Visitor Agreement provides:

"These Terms shall be governed by the laws of the State of New York, without regard to conflict

of law principles."  (Second Visitor Agreement at 23.)  Petitioners' argument, citing *Brooks*, that

California law nevertheless applies because "California has the strongest interest here because

Pilon claims the protection of that state's laws, [and it is the state] where he lives, where all the

relevant events took place, and where all the contracts were formed" (Opp. Cross-Mot. at 17

n.3), is inapposite, since a valid choice-of-law clause trumps ordinary interest analysis in

selecting which law governs a contract dispute.  *See Fin. One Pub. Co. Ltd. v. Lehman Bros.*

---

[5] The same jurisdictional principles implicated by selecting choice-of-law rules in a
federal question case, 28 U.S.C. § 1331, apply here as well.  For the same reasons explained in
note 2, *supra*, the Court will apply New York's choice-of-law rules.

*Special Fin., Inc.*, 414 F.3d 325, 332-33 (2d Cir. 2005). *Brooks* does not compel a different

result because it considered a challenge to formation, which, as already explained, cannot be

governed by a choice-of-law clause contained in the very agreement that one party has argued is

invalid. *See Brooks*, 2024 WL 3330305, at *9.

      That leaves the enforceability of the choice-of-law clauses under New York law. "New

York courts *used* to look to [considerations such as] significant contacts, interest in the litigation,

and the public policy of the foreign jurisdiction [] even when faced with a contract with a New

York choice-of-law provision." *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 91 (S.D.N.Y.

2021) (collecting cases under the old regime). But following the New York Court of Appeals'

instruction that "New York courts should not engage in any conflicts analysis where the parties

include a choice-of-law provision in their contract," *Ministers & Missionaries Benefit Bd. v.

Snow*, 26 N.Y.3d 466, 474 (2015), New York courts now "refuse[] to consider the public policy

of foreign states—including California—to overturn an otherwise valid contractual choice of law

provision." *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819, 2018 WL

6786338, at *22 (S.D.N.Y. 2018) (emphasis omitted) (collecting cases); *see also Petróleos de

Venezuela S.A. v. MUFG Union Bank, N.A.*, 41 N.Y.3d 462, 474 (2024) (reaffirming the

*Ministers* rule with three exceptions not relevant here). Accordingly, the Court is to apply New

York law to govern Petitioners' challenges to the enforceability of the Second Visitor

Agreement.

### 2.      Modification of the First Visitor Agreement

      The penultimate question in this case is whether the Second Visitor Agreement actually

modified the First Visitor Agreement. Petitioners, in opposing Discovery's cross-motion, argue

that the purported modification violates California law's implied covenant of good faith and fair

dealing and is thus unenforceable. (*See* Cross-Mot. Opp. at 22-24.) Of course, the interpretation

and enforceability of the Second Visitor Agreement is a matter of New York law,[6] and so the

Court must apply New York's analogous covenant.

"Under New York law, 'implicit in all contracts is a covenant of good faith and fair

dealing in the course of the contract performance.'" *DBT Gmbh v. J.L. Min. Co.*, 544 F. Supp.

2d 364, 384 (S.D.N.Y. 2008) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389

(1995)). "The covenant 'embraces a pledge that neither party shall do anything which will have

the effect of destroying or injuring the right of the other party to receive the fruits of the

contract.'" *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir.

2007) (quoting *Dalton*, 87 N.Y.2d at 389). "In determining whether a party has breached the

obligation or covenant of good faith and fair dealing, a court must examine not only the express

language of the parties' contract, but also any course of performance or course of dealing that

may exist between the parties." *Id.* (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)).

However, the covenant does not come from thin air, but from the promises the parties have

actually made to each other through contract. *Benex LC v. First Data Merchant Servs. Corp.*,

695 F. App'x 12, 15 (2d Cir. 2017) (summary order) ("Under New York law, the implied

covenant of good faith and fair dealing can only impose obligations consistent with the terms of

the contract, and the implied covenant cannot add substantive terms not included therein.").

That partially explains why "New York law does not recognize a duty of good faith in the

formation of a contract." *Mendez v. Bank of Am. Home Loans Serv., LP*, 840 F. Supp. 2d 639,

---

[6] Although the parties' references to the effect of the Second Visitor Agreement at times appear like challenges to the validity of that agreement, as the Court has already explained, *supra* § III.A.1, Pilon and Discovery formed a valid contract in entering into the Second Visitor Agreement. Determining whether applicable contract principles permit enforcing the Second Visitor Agreement to override the First Visitor Agreement thus involves, properly understood, a blend of interpretation and enforcement considerations that are governed by New York law pursuant to the visitor agreements' choice-of-law provisions.

653 (S.D.N.Y. 2012) (citing *Frutico S.A. de C.V. v. Bankers Trust Co.*, 833 F. Supp. 288, 300

(S.D.N.Y. 1993)).  So, Petitioners cannot argue that the implied covenant prevented the

formation of the Second Visitor Agreement via valid modification.  Indeed, the implied covenant

of good faith ordinarily works to save provisions allowing *unilateral* modifications—even

retroactive ones—from being considered illusory, since the covenant bars the party with

unilateral power to modify from using that power capriciously.  *See e.g.*, *Eiess v. USAA Fed.*

*Savings Bank*, 404 F. Supp. 3d 1240, 1250-51 (N.D. Cal. 2019).  Petitioners' primary cases on

this point—albeit not applying New York law—bear out this principle.  *See Peleg v. Neiman*

*Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1467 (Cal. Ct. App. 2012) (refusing to enforce a

unilateral modification to an arbitration provision under Texas law); *Peng v. First Repub. Bank*,

219 Cal. App. 4th 1462, 1474 (Cal. Ct. App. 2013) (explaining that the implied covenant of good

faith regulates the use of the power to unilaterally modify a contract); *Cobb v. Ironwood Country*

*Club*, 233 Cal. App. 4th 960, 963 (Cal. Ct. App. 2015) ("When one party to a contract retains the

unilateral right to amend the agreement governing the parties' relationship, its exercise of that

right is constrained by the covenant of good faith and fair dealing which precludes amendments

that operate retroactively to impair accrued rights.").  Petitioners' argument does not extend to

mutual modifications, however, as it is a basic principle of contract law that parties to a contract

cannot prohibit their own ability to validly modify their contract sometime in the future.  *See*

Restatement (Second) of Contracts § 311 cmt. a (1979) ("The parties to a contract cannot by

agreement preclude themselves from varying their duties to each other by subsequent

agreement.").  Here, though the Second Visitor Agreement became effective after Pilon provided

notice of the accrual of his claim, it was the parties, rather than Discovery alone, that effectuated

that agreement.  New York's (or even California's) implied covenant of good faith and fair dealing does not prevent parties from mutually modifying their contracts in such a way.

Accordingly, the Court concludes that the Second Visitor Agreement's modification of the First Visitor Agreement does not violate New York's implied covenant of good faith and fair dealing.

### 3.    Unconscionability

The final issue to resolve is Petitioners' argument that the Second Visitor Agreement's arbitration provisions are unconscionable and therefore unenforceable.  (*See* Pet. Mem. at 20-26; Cross-Mot. Opp. at 24-32.)  Again, Petitioners rely primarily on California law when New York's unconscionability doctrine governs.  Still, many of Petitioners' arguments map onto New York's requirements.

"Under New York law, a contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'"  *Ragone*, 595 F.3d at 121 (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988)).  Defeating a contractual obligation on unconscionability grounds generally requires demonstrating "both procedural and substantive unconscionability."  *Haft v. Haier US Appliance Sols., Inc.*, 578 F. Supp. 3d 436, 451 (S.D.N.Y. 2022) (citing *Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 201 (S.D.N.Y. 2022)).  And although state law supplies the unconscionability doctrine even in an FAA case, that doctrine may not be "applied in a fashion that disfavors arbitration" as opposed to other contracts.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011); *see also Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297 ("In *Concepcion*, the Court held that the FAA preempted a California judicial rule regarding the unconscionability of class arbitration waivers in consumer contracts . . . .").

The procedural unconscionability prong considers "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 351 (S.D.N.Y. 2014) (quoting *Gillman*, 73 N.Y.2d at 10).  In line with those considerations, Petitioners contend that the Second Visitor Agreement is procedurally unconscionable because "it is a contract of adhesion" drafted and offered by Discovery without any opportunity for negotiation.  (Pet. Mem. at 20-21.)  But in New York, being offered contract terms on a "form . . . offered on a take-it-or-leave it basis" is generally "insufficient to render the contract unconscionable, particularly when the [party charging unconscionability] had the ability" to take its business elsewhere.  *Anonymous v. JP Morgan Chase & Co.*, No. 05-CV-2442, 2005 WL 2861589, at *6 (S.D.N.Y. 2005); *see also Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 558-59 (S.D.N.Y. 2018) ("Airbnb's TOS is a standard adhesion contract, which does suggest some level of procedural unconscionability. . . . However, this is not sufficient to invalidate the arbitration provision."); *Ragone*, 595 F.3d at 122; *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571-72 (S.D.N.Y. 2009).  That is the case here, as Pilon was free to take his business to a different streaming service.  Moreover, Petitioners do not argue that Pilon is illiterate or otherwise unable to understand the contracts he enters.  To the contrary, and undermining their argument for procedural unconscionability here, Petitioners explain that Pilon read the First Visitor Agreement—presented in essentially the same form as the second one—and expected those terms to govern his relationship with Discovery.  That he did not expect the Second Visitor Agreement to modify the anti-retroactivity provision of the First Visitor Agreement does not create any procedural unconscionability, especially because Discovery

explicitly identified changes to its arbitration provisions when it notified Pilon and others of the new terms. (*See* Waibel Dec. ¶¶ 12-14.) Therefore, even though there may have been a degree of procedural unconscionability, because Pilon had no opportunity to negotiate the terms in the Second Visitor Agreement, its impact was minimal.

Substantive unconscionability, on the other hand, "requires an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Haft*, 578 F. Supp. 3d at 452 (quotation marks omitted). At the outset, Petitioners' argument that the agreement here is substantively unconscionable under California's anti-class-arbitration-waiver rule is irrelevant, since New York law governs the enforceability of the Second Visitor Agreement and contains no such rule. Petitioners contend also, however, that the Second Visitor Agreement's arbitration provisions are substantively unconscionable because they apply retroactively, impose notice and affidavit requirements, stage the processing of claims, and require opt-out to proceed to litigation following the staged claim-resolution process. (*See* Pet. Mem. at 22.) None of those arguments are availing.

To begin, not even California law—which Petitioners would have this Court apply— renders retroactive arbitration provisions in consumer contracts unconscionable. *See Brooks*, 2024 WL 33030305, at *17 (distinguishing retroactive arbitration provisions in employer contracts from those in consumer contracts, for the latter of which "courts have permitted this kind of retroactivity"). And the arbitration provisions themselves do not appear to unreasonably favor Discovery, for even if they do require consumers to send Discovery affidavits or to proceed in batches, that does not abridge consumers' substantive rights in any way or require them to do more than what is often required in ordinary (or multi-district) litigation, where complicated submissions and delays are common. To the contrary, Petitioners do not contest Discovery's

characterization of the JAMS procedure as unreasonably favoring mass claimants by allowing law firms to "use the . . . fee structure to cause massive fees to be assessed on Discovery, thereby enabling [the firm] to extract a windfall settlement untethered to the merit of those claimants' claims."  (Cross-Mot. Mem. at 11.)  That the Second Visitor Agreement reverts to a procedure that prevents that manipulation of the arbitral forum's fee structure, even if overcorrecting, is not so substantively unreasonable as to be unconscionable.

Petitioners' cited cases are inapposite.  First is *MacClelland v. Cellco Partnership*, 609 F. Supp. 3d 1024 (N.D. Cal. 2022).  As Judge Failla explained in *Brooks*, the *MacClelland* court was concerned that an arbitration procedure—"plagued by delays"—would work to stall claims past their expiration, as the respondent had refused to toll claims pending their completion of the staged arbitration process.  *Brooks*, 2024 WL 3330305, at *17.  That is not the case here, because the NAM procedure contained in the Second Visitor Agreement provides that "[a]ny applicable limitations period (including statute of limitations) and any filing fee deadlines shall be tolled beginning when the Mandatory Pre-Arbitration Notice and Informal Dispute Resolution Procedures are initiated."  (Second Visitor Agreement at 18.)  Also concerning to the court in *MacClelland* was the lack of a right to opt out of arbitration following the phased procedure, which, like in *Brooks*, is not a concern with the NAM arbitration procedure as contemplated by the Second Visitor Agreement.  *See Brooks*, 2024 WL 3330305, at *17.

Petitioners' second case, *Heckman v. Live Nation Entertainment, Inc.*, 120 F.4th 670 (9th Cir. 2024), brought to the Court in supplemental briefing (*see* Pets. Supp. Ltr.) is similarly inapposite.  First, *Heckman* concerned an unconscionability challenge to mass-filing arbitration provisions under California law, not New York law, and so its explicitly "alternative" holding regarding California's particular anti-class-action-waiver rule is not relevant here.  *Cf. Heckman*,

120 F.4th at 689-90.  Second, the mass-filing procedures at issue in *Heckman*—and, correspondingly, the unconscionable aspects of it—are not present.[7]  For example, the *Heckman* court took issue with the fact that early "bellwether" arbitrations could have binding precedential effect on subsequent arbitrations, thus diminishing the rights of subsequent claimants to be heard on all aspects of their claims.  *See id.* at 684-85.  Petitioners identify no similar provision in the NAM procedure or Second Visitor Agreement.  The court also took issue with restrictions on discovery and briefing allowed under the mass-filing provisions, *id.* at 685-86, concerns which are not implicated by NAM arbitration.  (*See* Resp. Supp. Ltr. at 2.)  Likewise, Petitioners make no argument that this case involves the types of lopsided appeal and arbitrator-selection rights as were at issue in *Heckman*, *cf.* at 686-87.  Finally, and contrary to Petitioners' assertions, unconscionability does not "permeate[]" (*cf.* Pet. Mem. at 26) the Second Visitor Agreements' arbitration provisions, for the same reasons that the particular procedures identified are not substantively unconscionable.

Accordingly, the Court concludes that the arbitration procedures specified by the Second Visitor Agreement are not unconscionable and may be enforced as to Pilon.

## IV.    Conclusion

For the forgoing reasons:  The petition to compel arbitration before JAMS (ECF No. 1) is GRANTED as to Russell Stephen and DENIED as to Brian Pilon.  The cross-motion to compel arbitration before NAM (ECF No. 18) IS DENIED as to Russell Stephen and GRANTED as to Brian Pilon.  The motion for discovery concerning Russell Stephen's assent to the Second

---

[7] Note that while the following citations are from the *Heckman* court's discussion of the unconscionability of the delegation clause in that case, the court concluded in cursory form that "[t]he provisions of the arbitration agreement and New Era's Rules that make the delegation clause unconscionable also serve to make the entire agreement unconscionable."  *Heckman*, 120 F.4th at 688.

Visitor Agreement is DENIED. And this action is hereby STAYED pending the completion of the arbitrations contemplated by the parties' agreements. *See* 9 U.S.C. § 3.

The Clerk of Court is directed to close the motion at ECF No. 18 and to mark this case as stayed.

SO ORDERED.

Dated: March 10, 2025
New York, New York

_____
J. PAUL OETKEN
United States District Judge